USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/9/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEAN LOREN
      Plaintiff

    -against-

THE CITY OF NEW YORK; MANHATTAN COMMUNITY
ACCESS CORPORATION; DANIEL COUGHLIN; JEANETTE
SANTIAGO; CORY BRYCE, GALE BREWER AS
MANHATTAN BOROUGH PRESIDENT, ENRIQUE
HERNANDEZ JR, PRESIDENT OF INTER-CON
SECURITY, INTER-CON SECURITY, ROBERT B.
SCHUMER,  ROBERT D. MARCUS AS FORMER CEO OF
TIME WARNER CABLE, KYLE O. WOOD, ROBERT PERRY,
GLORIA MESSER, TIME WARNER CABLE, JUNE W.
MIDDLETON, CHRIS GETHARD, and ZENAIDA MENDEZ
      Defendants

---X

   :    FIRST AMENDED
        COMPLAINT

   :

   :    Jury Trial Demanded

   :

   :    16 Civ. 3605 (CM)

   :

Dean Loren, Plaintiff, respectfully alleges as follows:

### NOTICE OF CONFLICT - COLLEEN MCMAHON WITNESS

1. Chief Judge Colleen McMahon by her July 14, 2016 order, requests Dean Loren to amend his Complaint against MNN for being banned for his free speech and other issues.

2. Dean Loren personally spoke with Judge McMahon outside the 5th Floor Courtroom on June 24, 2016, 10 AM about exiting Judge Pauley's MNN Banning hearing for Deedee Halleck and witnessing the horrific assault by a man on a woman, Lidya M. Radin and the malicious prosecution by AUSA Stephanie Lake that was taking in place in the 5th fl. Courtroom.

3. Chief Judge McMahon and I discussed how AUSA Lake failed to identify the time, Inter-Con Security Agent name, location and witnesses of an assault on Lidya Radin that took place on January 28, 2016 at 11:00AM with Kyle O. Wood and Magistrate Peck, several US attorneys and Marshals and the unidentified Inter-Con Security Agent then meeting in secrecy in Peck's Court to review the tapes and make plans how to charge Lidya M. Radin.

4. Chief Judge McMahon asked me to send personally to her at her office the information of the pending felony prosecution of Radin and the Inter-Con Security Breach.

5. On information and belief, both Lidya and I, were intended targets of Inter-Con Security.

## JUDGE MCMAHON CONFLICT: DOUBLE STANDARD OF UNDERLYING FACTS

6. Chief Judge Colleen McMahon issues an order with a double standard concerning Preet Bharara's US Attorneys like AUSA Stephanie Lake and civil litigants like Dean Loren.

7. Chief Judge McMahon permits AUSA Stephanie Lake to prosecute without any basic information and Judge McMahon is demanding that Dean Loren fully describe the facts, including but not limited to, (i) Kyle O Wood and Magistrate Peck having an ex parte meeting while Radin is handcuffed on a bench across from me and I am physically arrested, by US Marshal Locke (I believe), (ii) for witnessing the criminal assault on Radin by an Inter-Con Security Officer while he was receiving instructions over a wireless transmitter, who on information and belief, is an ex-felon and non-bonded, and (iii) and whose employer Inter-Con Security, a security firm with contracts and contacts with (a) Judge McMahon, (b) The US Marshals, (c) CJA Joshua Levine, and (d) the SDNY US Attorney's Office for federal protection services of Judges, the Courthouse and Litigants of the Courthouse.

8. The Inter-Con Security Federal Protection Service Contract is worth billions of dollars and extends to every US Embassy, State Department and International Port Security Contract.

9. The Inter-Con Security Contracts also extend to Al D'Amato's Electron Gaming clients.

10. Chief Judge Colleen McMahon shares a close relationship with Al D'Amato.

## CHIEF JUDGE MCMAHON CONFLICTS AND HALLECK'S EXPOSE' OF INTER-CON

11. On information and hard evidence, Deedee Halleck exposed (i) a billion dollar private security army begun by George Herbert Bush in 1975 by (ii) videoing the MNN Board meeting, Inter-Con Security contracted Staff at the Firehouse, and meeting to discuss the sale of real estate, channels (iii) video cables to be used for security cameras and gaming resulting in billions of dollars of revenue associated with Al D'Amato and New York Gaming and (iv) the discussion of MNN's Article 9 By-Laws Mandated Financial Plan Report for 2012.

12. The By-Laws of MNN Article 9, Section 9.8 Financial Plan expressly states, **"The President shall prepare, in consultation with the Finance Committee, and the Board shall adopt no later than the last day of the third month following the end of the preceding fiscal year, a one-year financial plan, including income statement, balance sheet, capital acquisition program and operational plan. Such plan shall thereafter be prepared annually, no later than the last day of the third month following the end of the preceding fiscal year.**

13. On Information and belief, **MNN's By-Laws Article 9 Mandated Financial Report for 2011, 2012, 2013, 2014, and 2015 is going to show (a)the acts by the Board under Coughlin to sell off MNN assets for personal gain (b) under Zenaida Mendez's direction to promote political content and (c) terminate producers like Halleck, Radin and Loren.**

14. SDNY Courthouse, 500 Pearl Street operates under Verizon and Time Warner Cable systems.

15. The Jan 28, 2016, 20th floor assault outside Pauley's court, at approximately 10:59: 30 AM by a black hispanic man, 5'7", who failed to identify himself several times, occurred while Radin peacefully attempted to exit into the elevator with Robert Perry, Esq. (Deedee's attorney) following an MNN hearing for Halleck being banned for video taping a meeting while Dean Loren simultaneously reported to the FCC and federal agencies, the (i) sale of MNN's building on 537 W. 59th Street and the adjoining NYC Park property to D'Amato/Trump, and (ii) and Zenaida Mendez using MNN to produce political content using MNN resources for Charles Rangel, Gale Brewer, Robert Jackson, and Hillary Clinton.

16. Dean broadcasted the information during his regular series shows "<u>every</u>" Thursday afternoon at 4:30 PM and then when possible on Monday's at 4:30 PM for the last four years.

<u>CHIEF JUDGE MCMAHON'S CONFLICT THREATENS PERRY, HALLECK, LOREN</u>

17. Loren and Radin forced Perry to cite Manhattan Borough President ("MBP") Scott Stringer and now MBP Gale Brewer as the "State Actors" in Halleck's Amended First Complaint to which this instant 1st Amended Complaint by Loren tracks for many factual reasons.

18. After reviewing Deedee's videos and Paula Gloria's videos of MNN violations, I attest that (i) Zenaida Mendez captured on video personally refused Halleck, Melendez, Paula Gloria and Joe Barton admittance to the MNN Board Room Meetings and (ii) Zenaida was on the phone receiving instructions at the time the videos were taken by Halleck and Paula Gloria.

19. Zenaida Mendez (i) organized Former MNN Employee Rick Junger to run the control room for Rick Gethard and (ii) terminated my November 2012 election night open studio booking for Gethard and Junger which caused me to have to fight for the right of broadcasting my weekly series show with MNN featuring the only Internationally known Black Shoe Designer John Ashford of Living Color, and other well known Black TV Shows and Films while Zenaida Mendez had arranged for both studios to be take over by all white activists to get out the College vote across the nation, which left Loren and 20 diverse models of every color and a really nice folk guitarist in the lurch without a performance space for their weekly show.

CHIEF JUDGE COLLEEN MCMAHON'S CONFLICTS WITH BRYCE AND SANTIAGO

20. Cory Bryce personally called Manhattan North to break up a peaceful producer unionizing meeting on or about September 23, 2014, organized by Lidya Radin and in attendance by several producers shown on VIDEO TAPE after bringing the issue of banning directly to Gale Brewer's Chief of Staff in MBP Gale Brewer's Official Office by a personal meeting on or about June 10, 2014 of MBP Brewer's Chief of Staff Jessica Mates, Lidya, Deedee, Josh Wolinski, Gloria Messer, Alan Steinfeld and others, including but not limited to Dean Loren who could not make the meeting but was represented by Radin.

21. On information and belief, Paula Gloria was banned for videotaping the NYPD cop with tape over his badge, union busting the September 23, 2014 meeting at MNN Public Access Station.

22. Deedee fails to cite in Halleck v. The City of New York  15 Civ 8141 before Judge Pauley, that (i) Cory Bryce and Jeannette Santiago keep secret files just like the Nazi SS, on producers to build cases to ban them and (ii) that Gloria Messer has the largest file with mine second.

23. Bryce and Santiago targeted Messer and Loren because (i) both Gloria and Dean help produce studio shows for MNN producers who need certified producers to run the MNN equipment,  (ii) to purposefully blocked hundreds of public producers from access of their free speech by harassing Gloria and Dean, (iii) and Gloria and Dean stand up for their civil rights.

24. Bryce and Santiago's MNN Secret Files that MNN Producers are not allowed to see, contain alleged complaints and false statements made about the MNN Producers by Staff and others.

25. Judge Colleen McMahon's conflict with D'Amato, Verizon and Time Warner, and the theft of public monies and services by Dan Coughlin and Zenaida Mendez , combined with Judge Colleen McMahon's unwillingness to stop the violence by Inter-Con Security against litigants and guests at 500 Pearl Street, threatens Perry, Halleck, Gloria Messer and Dean Loren, including but not limited to,

PARTIAL LIST OF BANNED AND THREATENED PRODUCERS
WITH MNN SECRET FILES MAINTAINED BY CORY BRYCE

Lidya Radin, Paula Gloria, Joe Barton, Frank Craven, Winston Gilchrist, Woody Henderson, Sissy Gamache, Nat Wood, Joan Allen, Molly Cheshire, Deedee Halleck, Jesus Melendez, Harold's black lady assistant, John Haggins, Krystal Hart, What The Fuck TV Producer Nelson Torres, Adina Marmelstein, Richard Renda, and at least 35 more producers.

26. An example of a secret complaint is one made by Jeannette Santiago to which she personally lied to cause Loren's permanent banning in July 30, 2014, to cover up that I told her while I stood in the hallway at 4:20PM and she sat at her desk some 15 to 20 feet away, that I was going to report her to Greg Sutton for her purposefully refusing to file my weekly show info that had been agreed to by Sutton on January 4, 2016 for the Open Studio weekly show.

27. Bryce and Santiago produced no complaint nor witness statements.

28. Cory Bryce came running to me that day begging me not to report that Cory Bryce deleted my booking which Jeannette was suppose to have filed as a Series for every Monday Afternoon from 3:30 to 4:30 pm in the Open Studio as agreed to by Greg Sutton on January 4, 2014 and to which Dean Loren was scheduled for the following seven months in the Open Studio.

29. Gloria Messer personally witnessed me standing at the fishbowl and caught on security camera that there were no problems with Jeannette and remembers only me, not Jeannette, standing there looking anguished. MNN refuses to produce the security videos.

30. The fishbowl staff witnessed Jeannette trying to create an incident when the only incident was one was caused by her and Cory deleting my live 6 piece band without telling me.

31. Greg Sutton called Gloria and pulled Gloria into his office in August 2014 to interrogate her on what she saw but did not include that in any report and threatened her with being banned.

32. Greg Sutton was heard and seen on or about July 10, 2014, by a minimum of 15 producers and staff on the editing floor screaming at the top of his lungs like a lunatic that Gloria was going to be banned for asking why MNN didn't hire more staff with such a large budget.

33. I was in the editing suite with a Black Christian, we were floored with the hostility, and that's when the Black Christian explained to me that MNN was "mobbing" producers to get them to react and to create incidents that would justify them on paper being banned from MNN.

34. In August 2014, I brought this up to Greg Sutton in his office and he almost had a breakdown in the meeting while Cory recorded the meeting on his laptop by video to be recorded in my secret MNN producer file maintained by defendants Cory Bryce and Jeannette Santiago.

35. Jeannette changed all my erroneous electronic information regarding RUA Star one week after I filed this lawsuit after asking her for two years to change the wrong information.

36. Cory deleted my booking for the open studio, live show with O' Cassius Band, to do a political content pre-recorded taped show against China using a Tibetan monk.

37. Loren' show, Little Valley Music, was scheduled live with a 6 piece band booked a month ahead of time and confirmed to Cory, and terminated by Cory in the same manner that Zenaida Mendez terminated my booking for the Night of the November 2012 elections to put Rick Gethard in the Open Studio to do political content while I was forced to do my fashion show featuring the only Black Haute Couture shoe designer in the World with 20 girls in the closed studio after kicking out the Occupy Wallstreet Fake White Students who weren't booked.

38. Rick Gethard, white comedian did an all white show getting out the vote to college campuses across the nation including ordering pizza against MNN Policy/regulations and Zenaida who ran the Fake Occupy Wall Street Action had Fake O.W.S. White Actors run the closed studio.

39. On information and belief, Gethard and Zenaida intend to terminate RUA Start on Election Night, November 2016 and broadcast Gethard from the Open Studio to promote Clinton.

40. I watched Coughlin sit like a puppy dog on the spiral staircase steps many Wednesday Nights watching Rick's show as Gethard broke all the MNN rules and regulations.

41. The reason my show was scheduled live for 2016 was because I caught Rich Speziale deleting my RUA Star bookings in December 10, 2013 for Vinnie Vella Show and brought it directly to Greg Sutton's attention with the photograph of the Computer showing Speziale putting himself in our slot when our printout said I booked it which forced Greg to book us.

42. Gregg Sutton made it a policy in January 2014 for all live shows to be booked for the full quarter so the staff like Zenaida, Speziale and Bryce couldn't terminate producer shows like Larry Parks' The Gold Show that Gloria produced on Thursday nights and RUA Star.

43. Greg Sutton's memos to the staff will confirm the exact time, date, and facts of Rich Speziale's deletion of my bookings and Paula Gloria's that demonstrate MNN's actions to violate the rights of producers, threaten them and violate MNN's zone of non-tolerance.

44. Loren also caught Devorah using her Training MAC Master and Slave function, tracking my key strokes to hack my passwords on an editing computer in the room where she was teaching but my computer was separate to which I immediately sent an email to MNN executive staff.

45. I filed a complaint with MNN that Devorah had accessed my personal files and was accessing other producers using the Master Slave function from her computer terminal that allowed her to see all the computers including Greg Sutton, Zenaida Mendez and Dan Coughlin's.

46. Greg immediately terminated Devorah's MAC Master Slave access after I reported her and banned me, again without a hearing, written complaint, witness statements, etc.

47.  In September 2015, Cory deleted RUA Star's booking for two weeks at 11:00 PM so that June Middleton could do a taped show in the open studio to make money for her business.

48.  Marlene Villafane had to personally bring this to Greg Sutton's attention to correct the bookings deleted by Cory Bryce so that our live bands (booked in advance) could play.

49.  Deedee Halleck exposed, on information and belief, is the "BUSH" Inter-Con Security security contracts for Time Warner, MNN, NYPD/FBI and the City of New York.

50.  Deedee's attorney Perry witnessed the Inter-Con assault on Radin, and on information and belief has been threatened, and lied that he didn't see anything in front of witnesses at the second hearing before Judge Pauley when he was caught on two videos during the attack.

51.  I have FOIA the federal videos FOIA Act Request No. 2016USMS3089 Subject:  Video Footage from William E. Bordley, Associate General Counsel/FOIPA Officer, Office of General Counsel of the Justice Department and US Marshals, and also the Incident Report show Perry caught on video during the assault in a federal courthouse by defendants Time Warner, MNN, The City of New York, and Inter-Con Security and Perry.

52.  Since 2012, Dean Loren has openly and peacefully contested by filing complaints with the FCC in April, May and September 2014 and the various US Senators and federal agencies, the sale of MNN assets, including the building on West 59th Street and channels by Dan Coughlin and Zenaida Mendez to produce political content using public access monies and effect electronic gaming interests fronted by Al Gore, Charlie Rangel and Al D'Amato in 2012.

53.  Robert Schumer, Senator Schumer's brother, arranged the sale of Time Warner and MNN assets for a $420 Million fee and has acted to sell the real estate and channels for MNN.

54.  Conflicts for Judge McMahon and Judge Pauley arise under their nominations conducted by Judah Gribetz of Mudge Rose, Richard K. Eaton of Strook  Strook & Lavan/ Mudge Rose and Chester Straub of Wilkie Farr, and Al D'Amato who have interests in the Time Warner Sale.

55.  As agent of Inter-Con Security, Al D'Amato's conflicts with Chief Judge Colleen McMahon and Judge Pauley, extend to the video cables and channels for NYC Gaming Casinos in Hotels, Inter-Con Security Camera contracts and Walt Disney communications properties.

## NATURE OF ACTION

56. Plaintiff brings this action for preliminary and permanent injunctive relief, compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988

for violation of my civil rights under 42 U.S.C. §1983 and the First Amendment to the United States Constitution. Plaintiff also asserts supplemental claims under New York law.

57. The City of New York ("the City") has created an electronic public forum-- the cable public access public channels in Manhattan--delegating control of that forum to the Manhattan Community Access Corporation, commonly known as Manhattan Neighborhood Network ("MNN"), an entity largely funded by the City through cable television franchise fees and whose board of directors includes City employees, including but not limited to Gale Brewer, Manhattan Borough President ("MBP Brewer"). MBP Brewer appoints at least two board members whose duty is to represent cable producers such as the Plaintiff. Exercising its delegated authority, MNN has barred plaintiff Loren from MNN facilities and censored plaintiff Loren's programming, all because MNN officials disagree with plaintiff's viewpoints critical of MNN's administration and management of the cable public access channels in Manhattan, in violation of plaintiff's rights to freedom of speech under the First Amendment and Article 1, Section 8 of the New York State Constitution. MNN has further prevented members of the general public, including plaintiff, from attending and videotaping regular meetings of MNN's board of directors in violation of the New York Open Meetings Law, and committed violations of its charter, By-Laws and policy, including but not limited to obtaining Board minutes, Reports authorized to be produced by the Board at the beginning of each year pursuant to the By-Laws of MNN, By-Laws of MNN, and not-for-profit 501(c)(3) laws under federal and New York State Statutes, seizing plaintiff's time slot and studio space and to air political content, prohibiting plaintiff from obtaining a live spot after 7 pm, refusing to correct and continuing to publish erroneous information about the plaintiff's shows, violating rules for programming, keeping secret files on plaintiffs, not producing complaining statements about producers, and prohibiting producers from a union of cable producers to safeguard their rights.

## JURISDICTION AND VENUE

58. This action is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 and the First Amendment to the United States Constitution.

59. The Court has jurisdiction over plaintiff's federal law claims under 28 U.S.C. §1331 and 28 U.S.C. §1343.

60. The Court has jurisdiction over plaintiff's supplemental state law claims under 28 U.S.C. §1367.

8

61. Venue is proper in the Southern District of New York under 28 U.S. §1391(b) in that a substantial part of the events giving rise to plaintiff's claims occurred in this district, including but not limited to the 20th floor of SDNY Courthouse and 537 W. 59th Street, NY, NY.

## JURY DEMAND

62. Plaintiff demands trial by jury of all issues properly triable thereby pursuant to Fed. R. Civ. P. 38(b) but is open to Arbitration as long as Halleck, Radin and Loren's ban is lifted and Halleck, Radin and Loren are each given $100,000 to be held in attorney escrow pending resolution.

## PARTIES

63. Plaintiff Dean Loren is a resident of the City, County, and State of New York, with an address Dean Loren, 203 West 107th Street #8A, New York County, New York, New York 10025 and telephone number (646) 228-0408.

64. Defendant THE CITY OF NEW YORK ("the City") is, and was at all times relevant herein a municipal corporation duly organized and existing under the laws of the State of New York. Address: Manhattan Borough President Gale Brewer, One Centre Street, 19th Floor, New York, New York 10007, Tel. 212 669 4305.

65. Defendant MANHATTAN COMMUNITY ACCESS CORPORATION, commonly known as Manhattan Neighborhood Network ("MNN"), is a not-for-profit corporation organized under the laws of the State of New York. Address MNN, 537 W. 59th Street, NY, NY 10019, Tel. 212 757 2670

66. Defendant DANIEL COUGHLIN is and was MNN's Executive Director at all relevant times herein. Defendant Coughlin is being sued in his individual capacity. Address: Dan Coughlin, MNN, 537 W. 59th Street, NY, NY 10019, Tel. 212 757 2670.

67. Defendant JEANETTE SANTIAGO is and was MNN's Programming Director at all relevant times herein. Defendant Santiago is being sued in her individual capacity. Address: Jeannette Santiago, MNN, 537 W. 59th Street, NY, NY 10019, tel 212 757 2670. Jeanette goes by many different spellings and aliases including Jennette.

68. Defendant CORY BRYCE is and was MNN's Manager of Production & Facilitation at all relevant times herein. Defendant Bryce is being sued in his individual capacity. Address: Cory Bryce, MNN, 537 W. 59th Street, NY, NY 10019, tel 212 757 2670. Like Santiago, Bryce spells his name many different ways and uses many different aliases like BRICE.

9

69. Defendant Manhattan Borough President Gale Brewer ("MBP Brewer") is and was an elected official of the City and Board Member of MNN at all relevant times herein.  Defendant MBP Brewer is being sued in her individual capacity. Address: Manhattan Borough President Gale Brewer, One Centre Street, 19th Floor, New York, New York 10007, tel 212 669 4305.

70. Defendant Enrique Hernandez, Jr. is and was Inter-Con Security President at all relevant times herein.  Defendant Hernandez, Jr. is being sued in his individual capacity. Address: Enrique Hernandez, Jr., Inter-Con Security c/o US Attorneys, 86 Chambers Street, 3rd floor, NY, NY 10007, tel. 212 637-0179. Hernandez operates a NYC office out of the US Attorneys offices.

71. Defendant INTER-CON SECURITY is a privately held company with security contracts at all relevant times herein and is on information and belief, duly registered to do business in the State of New York. Address: Inter-Con Security c/o US Attorneys, 86 Chambers Street, 3rd floor, NY, NY 10007, tel. 212 637-0179.  US Marshal Michael Greco is his supervisor.

72. Defendant Robert D. Marcus was CEO of Time Warner Cable at all relevant times herein.  Defendant Marcus is being sued in his official capacity. Address: Robert D. Marcus, c/o Time Warner Cable, 60 Columbus Circle, NY, NY 10023 tel 212 364-8221.

73. Defendant Time Warner Cable is a corporation organized under the laws of the State of New York at all relevant times herein. Address: Time Warner Cable, 60 Columbus Circle, NY, NY 10023 tel 212 364-8221.

74. Defendant Kyle O. Wood, was a SDNY Deputy Court Clerk for Judge Pauley at all relevant times herein. Defendant Wood is being sued in his individual capacity. Kyle O. Wood, c/o Judge William Pauley, 500 Pearl Street, 20th Floor, NY, NY 10007, tel 212 805 6393.

75. Defendant Robert Perry is an attorney representing Deedee Halleck in a similar action against MNN at all relevant times herein. Defendant Perry is being sued in his individual capacity. Address Robert Perry, Esq., 45 Main Street, Suite 230, Brooklyn, New York 11201, tel 212 219 9410.

76. Defendant Robert B. Schumer is an attorney representing Time Warner in the sale of its cable system and franchise at all relevant times herein. Defendant Robert B. Schumer is being sued in his partnership capacity and individual capacity.  Address: Robert B. Schumer,  c/o Paul Weiss, 1285 Avenue of the Americas, NY, NY 10019, tel 212 373-3000.

77. Defendant Gloria Messer is an MNN producer at all relevant times herein.  Defendant Gloria Messer is being sued in her individual capacity for her MNN files as she has been threatened by

Greg Sutton and very afraid of retaliation by MNN. Address: Gloria Messer, 240 East 55th Street, #8G, NY, NY 10022.

78. June W. Middleton, is an MNN producer at all relevant times herein. Defendant Middleton is sued in her individual capacity.  Address: June W. Middleton, 560 W. 43rd Street, Apt. 4E, NY, NY 10036, Tel, 212 239-6680.

79. Chris Gethard, produces at MNN at all relevant times herein. Defendant Gethard is sued in his official and individual capacity. Address Chris Gethard, Fusion TV c/o Jonathan Schwartz, General Counsel, Univision Communications, Inc.  605 Third Avenue, NY, NY 10158, tel. 212 455-5200.

80. Zenaida Mendez, MNN Employee at all relevant times herein.  Defendant Zenaida Mendez is sued in her individual capacity. Address: Zenaida Mendez, Manhattan Neighborhood Network, 537 W. 59th Street, NY, NY 10019, Tel 212 757 2670.

## STATEMENT OF FACTS

Cable Public Access Channels

81.  Cable operators use cable or optical fibers strung above ground or buried inducts to reach the homes and businesses of their subscribers.

82.  Because the construction of this physical infrastructure entails the use of public rights-of-way and often results in significant disruption of streets, alleys, and other public property, cable operators must obtain franchises from local governments.

83.  Almost all cable franchise agreements require cable operators —as a condition for easements to use the public rights-of-way-- to dedicate some channels for programming by the public ("cable public access channels")-- channels which "are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet." H.R. Rep. No. 934, 98th Cong., 2nd Sess. 30(1984), reprinted in, 1984. U.S.C.C.A.N. 4655, 4667.

84. Cable public access channels serve as a conduit for "groups and individuals who generally have not had access to the electronic media...to become sources of information in the electronic marketplace of ideas." H.R. Rep. No. 934, 98th Cong., 2nd Sess. 30(1984), reprinted in, 1984. U.S.C.C.A.N. 4655, 4667.

85.  Cable public access channels typically are available for the free use of the public on a first-come, first served, nondiscriminatory basis.

86.  Almost from the inception of cable public access channels, cable operators have been barred from exercising editorial discretion over such channels.

87.  In most communities, there is a single cable operator that provides service in a given geographical area.

88.  To ensure that cable operators, even absent competition from other cable operators in the same geographical area, provide "the widest possible diversity of information sources and services to the public," 47 U.S.C. §521(4), Congress enacted the Cable Communications Policy Act of 1984, Public Law No. 98-549, 98 Stat. 2780 (1984)("the 1984 Cable Act"), which included provisions relating to cable public access channels.

89.  The 1984 Cable Act ratified the pre-existing authority of local governments to require that cable operators, as a condition of cable franchise approval, provide cable public access channels. See 47 U.S.C. §531(a).

90.  The 1984 Cable act also prohibits cable operators generally from exercising any editorial control over any constitutionally protected expression appearing on cable public access channels. 47 U.S.C. §531(c).

91.  In regulating cable franchising by local governments in the State of New York, the New York State Public Service Commission ("PSC") has adopted certain minimum standards for cable public access channels, which the PSC defines as "channel(s) designated for noncommercial use by the public on a first-come, first-served, nondiscriminatory basis." 16 N.Y.C.R.R. 895.4(a).

92.  The PSC's regulations provide that every cable television franchisee with a channel capacity of 36 or more channels shall designate at least one full-time activated channel for public access use. 16 N.Y.C.R.R. 895.4(b).

93.  The PSC's regulations also provide that a municipality may designate an entity other than the cable operator to operate and administer the cable public access channels in that community. 16 N.Y.C.R.R. 895.4(c)(1).

94.  The PSC's regulations further provide that the designated entity shall schedule channel time on the cable public access channels "on a first-come, first-served, nondiscriminatory basis." 16 N.Y.C.R.R. 895.4(c)(4).

95.  The PSC's regulations further provide that neither the cable operator nor the municipality may exercise editorial control over cable public access channels except that a cable operator may take

such measures as may be authorized by federal or state law to prohibit obscenity or other content unprotected by the First Amendment. 16 N.Y.C.R.R. 895.4(c)(8)–(9).

96. The City has awarded cable franchises in Northern and Southern Manhattan to Time Warner Entertainment Company, L.P. ("Time Warner").

97. Section 8.1.1 of the respective franchise agreements requires Time Warner to set aside certain cable channels for public access programming.

98. Section 8.1.8 of the respective franchise agreements provides that the cable public access channels in Manhattan shall fall under the jurisdiction of an "independent, not-for-profit, membership corporation" -- a Community Access Organization or CAO--designated by the Manhattan Borough President.

99. Section 3.3.01 of the Grant and use Agreement by and between Time Warner and CAO annexed to the respective franchise agreements provides that: "The CAO shall maintain reasonable rules and regulations to provide for open access to Public Access Channel time, facilities, equipment, supplies, and training on a non-discriminatory basis and to the extent required by applicable law."

100. The Manhattan Borough President has designated the Manhattan Community Access Corporation--commonly known as Manhattan Neighborhood Network ("MNN")--to oversee the cable public access channels in Manhattan and the NYC City Counsel has approved CAO.

101. Incorporated in 1991, MNN is funded by the City from franchise fees collected not only from Time Warner but also from Verizon and RCN Corporation, which now are also franchised by the City to provide cable television service in Manhattan.

102. MNN's Board of Directors ("the MNN Board") is comprised of up to 13 members, two of whom are to be selected by the Manhattan Borough President and work full-time in the latter's office, which was unknown to Loren, Radin and Paula Gloria and other harmed producers.

103. In *Manhattan Neighborhood Network Policies*, MNN describes "Our Mission" as follows: "MNN is responsible for administering public access cable TV services in Manhattan. Our purpose is to ensure the ability of Manhattan residents to exercise their First Amendment rights through moving image media to create opportunities for communication, education, artistic expression and other non-commercial uses of video facilities on an open and equitable basis. In providing services, we seek to involve the diverse racial, ethnic and geographic communities of Manhattan in the electronic communication of their varied interest, needs, concerns and

13

identities."  Manhattan Neighborhood Network Policies, *available at* http://www.mnn.org/policies (updated May 2015).

104.     While MNN's principal offices and studio are at 537 West 59th Street in Manhattan, MNN opened the MNN El Barrio Firehouse Community Media Center ("the El Barrio Firehouse")--on property once occupied by a real firehouse.

105.     On information and belief, the Firehouse property was owned by the "Museo del Barrio" and flipped between the City of New York to hide the bad financial accountings of the Museo del Bario which then transferred the building to MNN in 2007 with the help of Rep. Charles Rangel at a large renovation price to MNN.

106.     Loren was a Board of Director for Hope Community that owns the property next door at the time just prior to the MNN purchase and was knowledgeable that the building was unsuitable for public access facilities because of space, cost and access and was a Rangel Deal.

107.     MNN was used to renovate the Firehouse Space using public monies with the intent of transferring the property to another non-profit when Time Warner sold to Comcast and/or Charter Communications for the purpose of setting up electronic gaming and security cameras.

Dan Coughlin Starts Suspension and Threats at Manhattan's Cable Public Access Channels.

108.     Plaintiff Loren has been involved in cable public access programming in Manhattan since 1994, not only as a producer but also an advocate of programming similar to Halleck, except that Loren challenged MNN Board Director George Stoney's abuse of public access to create an untenable atmosphere of retaliation beginning in 1997 but to which Halleck was exempt.

109.     On or about the evening of December 14, 2011, Deedee Halleck, Kym Clark, Carlos Pareja, Betty Yu,  Paula Gloria, Joe Barton, Joe Friendly came to the El Barrio Firehouse to speak at the MNN Borad regular quarterly meeting, being held that evening at the Firehouse.

110.     Dean Loren could not make the requested Board Meeting attendance via an independent Producer invite because he was trying to address problems created by Bryce and Santiago.

111.     Dean Loren wanted to attend as Jeannette Santiago and Cory Bryce were retaliating against him by preventing him from moving his show to a studio downstairs and forcing him to work with broken equipment in the express studio as reported by Loren on October 11, 2011 to Coughlin, Cory Bryce, Jeannette Santiago, Gloria Messer, Paula Gloria and Harold Channer.

112.     Dean Loren was also frozen out of the funds like Betty Yu's organization by Michael Eisenmenger, who handled the grants for MNN on the third floor, but in Dean's case, Michael

diverted the funds away from independent producers to favored video groups like Paper Tiger TV, Alianza Dominica, Democracy Now and Downtown TV and others.

113.     Plaintiff Halleck, Ms. Clark, Mr. Pareja, and Ms. Yu sought to urge the MNN Board to reinstate a community media grant program and youth program run by Betty Yu, a former MNN outreach employee, in China Town which had recently been discontinued after receiving substantial funding by MNN but because George Stoney was sick, they were cut out of funding.

114.     Loren worked with Betty Yu from 2010 to 2011 on several Chinatown food worker actions coordinated with Margaret Chin, who is now City Councilmember representing the area.

115.     Upon learning that plaintiff Halleck, Clark, Pareja and Yu were present, defendant Coughlin approached them and said that the MNN Board meeting was closed.

116.     Coughlin closed the meeting because Loren, Radin, Paul Gloria and others were demanding to attend meetings at the 59th Street location since January 2010 to current 2015.

117.     Loren had attended previous meetings with Gloria Messer, as an observer, on or about October 2007 to 2010 and requested George Stoney producer the MNN Yearly Financial Plan.

118.     When Halleck observed MNN's by-laws required regular MNN Board meetings to be open to the public, defendant Coughlin told her the by-laws had been changed, which was not true.

119.     Under MNN's Article 9 By-Laws, MNN mandated a Yearly Financial Plan Report to the Board at the beginning of each fiscal year that would discuss all major activities including sale of channels, purchase of equipment and sale or real estate, and year to come action plan.

**120.     On information and belief, this yearly financial report was what Dan Coughlin was trying to hide from Deedee, Dean, Lidya, Paula Gloria, Joe Barton and Gloria Messer.**

121.     To date, MNN has never produced the Article 9 financial report to the public, which is mandated by its By-Laws and would reveal the violations of MNN Coughlin and others.

122.     Loren complained in writing to the Attorney Generals Office, Department of Charities.

123.     Loren on December 27, 2011 had written Coughlin and Gloria Messer requesting "I would like to meet with the Board and Norris Chumley to discuss the studio rules and would like to know if this year the board is going to release its proposed budget written in the by laws.

124.     In early January 2012, Melendez accepted an invitation from Iris Morales, MNN's new Director of the El Barrio Firehouse, to join MNN's Community Leadership Program.

125.    On February 28, 2012, Halleck emailed Norris Chumley, a member of the MNN Board, requesting that she, Melendez, and Kym Clark be allowed to attend and speak at the regular quarterly meeting of the MNN Board in March 2012.

126.    On information and belief, Charley Rangel was approving money from the Upper Manhattan Empowerment Zone into the El Bario's Firehouse just like Sheldon Silver funneled money thru the Lower Manhattan Empowerment Zone into the Tenement Museum and Rapfogel's Metropolitan Council on Jewish Poverty with other MADOFF Stolen monies.

127.    On March 10, 2012, defendant Coughlin replied to Halleck by e-mail, inviting Halleck and Melendez and Ms. Clark to attend the regular quarterly meeting of the MNN Board at the El Barrio Firehouse on Wednesday evening, March 14, 2012.

128.    On Wednesday evening, March 14, 2012, at about 7:00 p.m., the MNN Board held a regular quarterly meeting at the El Barrio Firehouse.

129.    Pursuant to the invitation extended by defendant Coughlin, Halleck, Melendez and Clark attended the regular quarterly meeting of the MNN Board on Wednesday PM, March 14, 2012.

130.    Halleck brought a video camera to videotape the meeting.

131.    The Community Leadership Program also held its weekly training session that evening, Wednesday, March 14, 2012, at the El Barrio Firehouse.

132.    Melendez initially went to the training session but stepped out to attend the meeting of the MNN Board downstairs.

133.    As soon as Halleck began videotaping, the MNN Board, at defendant Coughlin's direction or with his approval, abruptly ended the meeting and adjourned.

134.    Melendez then returned to the training session upstairs.

135.    Shortly thereafter, Ms. Morales came into the training session and told Melendez that she wanted to speak with him.

136.    Melendez followed Ms. Morales out of the El Barrio Firehouse.

137.    On the sidewalk outside the El Barrio Firehouse, Ms. Morales screamed at Melendez, calling him "a Traitor."

138.    By the time that Ms. Morales finished her tirade, the training session was over.

139.    Melendez went back inside the el Barrio Firehouse, picked up his belongings, and left.

140.   The following Wednesday evening March 21, 2012, plaintiff arrived at the El Barrio Firehouse to attend the Community Leadership Program's weekly training session only to learn that he was barred from participation.

141.   The next day, Thursday, March 22, 2012, plaintiff Melendez called Ms. Morales for a clarification of his status in the Community Leadership Program and was told to come to the El Barrio Firehouse to meet with Ms. Morales the following day.

142.   On Friday afternoon, March 23, 2012, Melendez met with Morales in a studio at the El Barrio Firehouse.

143.   Morales screamed at plaintiff Melendez, threw crumpled papers at him, and at one point struck him, though not with great force.

144.   Using strong language but without raising his voice, Melendez told Ms. Morales that she was acting inappropriately.

145.   Hearing Morales's screams, an MNN security guard entered the office.

146.   Melendez got up and left the El Barrio Firehouse.

147.   On April 12, 2012, Dean had written Director of External Affairs Zenaida Mendez (Charlie Rangel's Agent), League of Women Voters President Miriam Adelman (who was NOW's agent) and Scott Stringer's Manhattan Borough President Chief of Staff Alaina Gilligo complaining about the use of the MNN's 59th Street facilities being used for political events for candidates Zenaida was pushing.  Dean had copied Dan, Cory, Larry Parks, Gloria, Vanessa Corwin (MNN Producer Board Representative), Peter Frank, Harold, Joe Friendly, and Barrie Switzen.

148.   Each year, MNN puts on this debate forum for democratic candidates sometimes moderated by Ann Northorp but mostly by the League of Women's Voters which never invites a republican or green party member to speak up at this time.

149.   Loren was a republican district leader and green party member and watched these bogus forums using MNN staff, facilities and time slots (without permission) of producers like Larry Parks and others to produce political content using MNN monies and staff.

150.   By letter dated April 12, 2012, defendant Coughlin informed Melendez that Ms. Morales had withdrawn her invitation to him to participate in the Community Leadership Program "due to conduct incompatible with the program's team-building and open communications values."

151.   In May 2012, Coughlin was gearing up for the political season at MNN.

152.    Defendant Coughlin stated --falsely-- that "your confrontational, disrespectful and loud behavior on March 23 necessitated an intervention from MNN staff alarmed about Ms. Morales's safety."

153.    Coughlin took no action against MNN Employee Devorah Hill for tormenting producers and treating them like children and cutting them off from services if they asked her to respect them from 2007 to 2012.

154.    Winston Gilchrist, Joan Allen, Dean Loren and many other producers were all victims of Devorah's confrontational, disrespectful and loud behavior.

155.    Joan Allen cried after one training session on or about May 2014 in front of Loren.

156.    Devorah refused to book Dean for classes to get certified until Loren filed a complaint with the Board to get final cut certification on or about March 2008.

157.    On information and belief, Ms. Morales withdrew the invitation to Melendez to participate in the Community Leadership Program, at defendant Coughlin's direction or with his approval, because Melendez had attended the regular quarterly meeting of the MNN Board on Wednesday evening March 14, 2012 with Halleck.

158.    Dean could not make the June 16, 2012 Firehouse, tour that Gloria emailed him to attend.

159.    On July 12, 2012, George Stoney dies and Deedee no longer has any power at MNN.

160.    On information and belief, George Stoney was Deedee Halleck's protector at MNN and once he was dead, MNN could do whatever they wanted to do to her without any repercussions.

161.    On July 19, 2012, MNN held an invitation-only formal opening of the el Barrio Firehouse and the event video shows Zenaida Mendez visibly blocking admission of Halleck and others.

162.    MNN invited, among others, a select group of "1%" public officials, including then MBP Scott Stringer and then City Council Member Melissa Mark-Viverito, to the opening.

163.    Even though they were not invited to the opening, Halleck and Melendez stood outside the entrance to El Barrio Firehouse during the opening, interviewing arriving invitees on video.

164.    Dean Loren watched the Video documenting Zenaida Mendez, Charlie Rangel's former chief of staff, and MNN Out-reach coordinator, and NOW representative for Hillary Clinton, denying access to Deedee Halleck and others while engaging in phones conversations.

165.    Loren affirms Zenaida is shown on the video as Loren has personally guested with Zenaida on a TV show with Harold Channer and telephone records will show who Zenaida contacted.

166.    When Jose Angel Figueroa, Ms. Morales's boyfriend and a participant in MNN's Community Leadership Program, arrived for the opening, Halleck asked him--politely--"Would you like to say something about public access?"

167.    Mr. Figueroa angrily replied to Halleck, "Don't fuck with me."

168.    The preceding language of Figueroa is consistent with his syntax as I use to work with Richie Perez, a Young Lord leader, and Panama, on the police murder of Anthony Baez murder campaign and met Figueroa at Julia Borges Community Center on several occasions.

169.    Melendez responded in kind, "Hey fuck you."

170.    Mr. Figueroa then rushed towards Melendez to assault him.

171.    On information and belief, an **Inter-Con contracted MNN security guard** intervened, grabbing Mr. Figueroa before he could strike Melendez.

172.    **On information and belief, the security guard is under an Inter-Con Security Contract that also services SUNY Colleges, SDNY Courthouse and US Embassies abroad.**

173.    Despite his attempted assault and battery on Melendez, Mr. Figueroa was allowed to enter the El Barrio Firehouse to attend the opening.

174.    A short while later, Melendez stated to Halleck as she videotaped him in front of the El Barrio Firehouse: "You know what's funny. I had to wait for my people to stop working in this building so that I can gain access to it. Do you understand what I'm saying? Our people, our people, people of color, are in control of this building and I have to wait until they are fired, or they retire, or someone kills them so that I can come and have access to the facility here. Because I am being locked out by people of color. There's irony for you."

175.    On information and belief, also in July 2012, Jeannette was now pushing the streaming services as the first step in selling Channel 57 under the Time Warner Deal.

176.    **Comcast and Charter were both making bids for the cable system and franchise while conducting partnership agreements with Time Warner, to promote video poker and gaming in office building conversions to hotels.**

177.    Richard Speziale refused to yield the Open Studio on August 23, 2012 to Loren's weekly live show which defendant Cory Bryce then sent me a warning letter to Dean Loren to cover-up Richard Speziale's actions for doing paid gigs for Vinnie Vella and screwing Loren's co-produced show out of time to set up on Weekly Series Live Tuesday Night Shows.

178.    On August 30, 2012 defendant Jennette retaliated against Loren for reporting MNN political activities on his Thursday afternoon weekly show and refused to consider him for openings in the downstairs studios or do anything to help Loren who was working in a broken down express studio with sub par equipment, including not changing the wrong information listings.

179.    Loren had emailed political violations of MNN for the DNCC that were scheduled for the studios on October 4, 11 and 25, 2012 to various authorities and filed FCC complaints.

180.    Robert B. Schumer of Paul Weiss also represents the DNCC.

181.    On August 30, 2012, Loren also emailed Senator Charles Schumer's aide Brian Fallon as one of the many recipients of the notice of political content by a non-profit.

182.    On September 27, 2012, Loren complained to Speaker Christine Quinn and Borough President Scott Stringer that defendant Cory Bryce was deleting Loren's bookings and those of other producers scheduled to go live.

**183.    Time Warner completed its re-organization for 2012 to prepare for selling its cable properties and commenced a huge bond campaign to raise money for the debt sale.**

184.    On information and belief, Robert B. Schumer as attorney representing Time Warner had arranged for Al Gore's Current TV to take over Channel 57 and flip it to Al Jezeera, which would front for the gaming channels for Empire Resorts, the client of Al D'Amato.

185.    In late August or early September 2012, Halleck submitted two programs to MNN's programming department for airing as "specials" on MNN's cable public access channels, including a program entitled "The 1% Visits the Barrio" aka as "1% Video."

186.    Based on the video footage taken by Halleck in front of the El Barrio Firehouse on July 19, 2012, "the 1%" presented Halleck's view of MNN as more interested in pleasing the 1% than addressing the community programming needs of those living in East Harlem, including Melendez, notwithstanding that MNN calls itself the Manhattan Neighborhood Network."

187.    On October 1, 2012, Loren complained directly to defendant Coughlin asking when the next MNN Board Meeting was going to take place with copies of the email to: defendant Cory Bryce (who spells his name Brice), Speaker Quinn, Vanessa Corwin - our Board Representative (who I worked on her shows), Rebecca, Anthony Keevan (a DNCC operative with a prime time show), defendant Gloria, Harold, and Paula Gloria.

188.    The 1% Video aired on MNN's cable public access channels at 8:30 am on October 2, 2012.

189.   By letter dated October 11, 2012 but not mailed until later, defendant Santiago MNN's Programming Director, informed Halleck that she was suspended for three months from airing programs over MNN's cable public access channels.

190.   Defendant Santiago stated the "the 1% video program airing on October 2, 2012 violated MNN program content restrictions barring "participation in harassment or aggravated threat toward staff and /or other producers."

191.   Defendant Santiago asserted, in particular, that Melendez's statement in the 1% video that "People of color work in this building and I have to wait until people get fired, they retire or someone kills them so that I can come and have access to the facility here." —incited violence and harassment towards staff and was in direct violation of MNN's "zero tolerance on harassment."

192.   MNN's zero tolerance on harassment did not apply to Rich Speziale, defendant Cory Bryce, defendant Zenaida Mendez and other MNN employees as expressed by several incidents to be cited below, including but not limited to, defendant Cory- defendant Zenaida-Rich going into producer bookings and deleting the bookings to secure their own programming for cash or political content without permission and in violation of MNN regulations and agreements.

193.   Defendant Santiago's assertion was false, as Melendez, in making the above statement in The 1% video neither intended to incite violence or harassment towards MNN staff nor did the statement have that effect.

194.   On October 22, 2012, defendant Jennette stepped up the streaming services to hasten the studio property and Channel 57 sales, without letting Producers know that the MNN studios were being sold by Coughlin at conferences like the NAB in Las Vegas, while Zenaida lobbied the Washington DC Alliance for Community Access and NOW resources for political content.

195.   Halleck did not receive the letter until October 24, 2012.

196.   By letter to defendant Coughlin dated October 25, 2012, Halleck appealed the decision to suspend her for three months from airing programs over MNN's cable public access channels.

197.   Halleck protested that defendant Santiago, in her October 11, 2012 letter, had selectively quoted Melendez's statement in the 1% video program and taken the statement out of context.

198.   Halleck pointed out that Melendez was merely expressing his despair at being barred from use of a neighborhood facility and denied that the statement incited violence or threatened anyone.

199.    On information and belief, the real reason for the suspension was because Halleck had questioned the transparency and accountability of MNN's management that was found in MNN's Article 9 Financial Report prepared yearly and videotaped by Halleck and requested by Loren.

200.    On October 26, 2012, Joe Barton's show was cancelled by defendant Jennette by email notice from Paula Gloria to defendant Coughlin, Board Members Nan Rubin, Vanessa Corwin, Peter Frank, Eileen Newman, Terry Lawler, Norris Chumley, Marva Allen, and to MNN producers Harold, defendant Gloria, Lidya, Dean, Joe Friendly, Ralph and Steve.

201.    I believe Paula Gloria used Dean Loren's board email list from an earlier complaint to the defendant MNN Board that defendant Zenaida was programming political content using MNN resources and staff and deleting regularly scheduled shows without permission.

202.    On Friday November 9, 2012, in front of Loren, Richard Speziale physically and verbally threatened Sissy Gamache, and insinuated that he would write her up for defendant Gloria not putting away a cord to which Sissy broke down and cried under the Spiral Staircase in front of Loren's eyes after her booking, to which I informed Sissy and Gloria that Rich was out of control.

203.    On November 13, 2012, Richard Speziale had ramped up his retaliation against Loren by refusing to yield the Open Studio to Are You A Star that Loren co-produced so Rich could finish Vinnie Vella's show that he was producing solo in violation of MNN policies and regulations.

204.    By letter to Halleck dated November 19, 2012 defendant Coughlin denied Halleck's appeal of her three-month suspension from airing programs over MNN's public access channels.

205.    On information and belief, on December 3, 2012, Dan and Zenaida negotiated for the sale of Channel 57 and HD upgrades for out-of-date equipment per Gloria Messer's evaluation and would have been noted in the MNN Article 9 Financial Planning Report requested by Loren.

206.    On December 4, 2012, defendant Cory removed all the purchased studio stools and took them to the Firehouse leaving the 59th Street Station with broken down roller chairs to retaliate against producers at the W. 59th Street Studio and promote political shows taped out of the Firehouse.

207.    On December 12, 2012, Paula Gloria attended MNN Board Meeting as an observer but Dean Loren could not attend because Loren was being falsely charged with the theft of $70,000 in a bank of Las Vegas which was actually stolen by Bank of America from Merrill Lynch's accounts.

208.    On December 21, 2012, Dean Loren broke the story that Bernie Madoff and his cousin Morton Madoff of Boston were laundering money thru Emily's list since 1986 that Zenaida Mendez and others were using to promote political content for a US Congressional action.

209.    On December 27, 2012, MNN Producer June Middleton, Esq. and Bryce started terminating Loren's bookings to schedule in Middleton for video shoots to promote her Harlem business.

210.    On February 6, 2013, Loren reported Devorah Hill arriving late and leaving early and causing Producers using the editing suites under her control to lose time editing their shows.

211.    On February 10, 2013, Loren caught Devorah Hill using a MAC Training Master Slave function to hack his computer terminal and collect his key strokes to his passcodes and filed an official complaint with Dan Coughlin, Vanessa Corwin, and Zenaida Mendez.

212.    **On February 11, 2013, Cory Bryce in retaliation for Loren catching Devorah hacking MNN computers using her Master/Slave function temporarily suspended Loren from MNN without a written complaint or witness statements or mentioning Devorah's wire fraud.**

213.    Loren had asked the new employee who had given the employee the order to close up early.

214.    Loren also complained about Devorah's hostile actions and her sexually-charged dialogue she used with Producers that would eventually cause a melt down with Joan Allen and others.

215.    April 4, 2013, Loren requested a name change for his Thursday Show to the John Ashford Show from Jeannette Santiago.

216.    On April 5, 2013, Paula Gloria complained to Speaker Quinn, Coughlin, Vanessa Corwin, Rebecca, Tony, defendant Gloria, Harold, and Dean that anyone on MNN's staff or board who said when a Board Meeting was going to happen was terminated from MNN.

217.    Dean Loren was suspended from MNN until May 15, 2013 without a hearing or opportunity to know who complained and why, but Devorah's wire fraud and hacking was not addressed.

218.    On August 16 to September 6, 2013, defendant Jennette Santiago started promoting political content for MNN through producer announcements pushing the Manhattan Borough President Debates featuring defendant Gale Brewer, Council 2 District Margaret Chin on Channel 34.

219.    On September 30, 2013, Deedee was scheduled to give an update on her banning to all the producers.

220.    On October 14, 2013, Paula Gloria's bookings for the open studio were terminated by defendant Cory Bryce and defendant Zenaida Mendez to produce political content copying defendant Jeanette, Gloria, Deedee, Joe Friendly, Lidya, Dean, Willie, Josh, Chuck and Larry.

221.    On November 8, 2013, Cory changed the rules for one producer who was certified to run the studio and on Dec 16, 2013 it would revert back to the two producer rule.

222. **On Information and belief, MNN sold Channel 57 in Jan 2013 to Al Gore's Current TV as part of MNN's W. 57th real property/Time Warner's sale to Comcast/Charter/Spectrum.**

223. On January 1, 2014, defendant Coughlin announces Channel 57 sold to Al Jezeera.

224. On January 30, 2014, Dean reported to Greg that Rich and Devorah had deleted his video transfers in the fish bowl staff office as retaliation for reporting them to the MNN Board.

225. On March 15, 2014, Dean Loren complained to Greg Sutton and defendant Cory that defendant Jennette had switch Are You A Star to the Closed Studio and that defendant Cory and Richard changed our bookings without consent to promote June Middleton's business.

226. On March 17, 2014, defendant Jeannette refuses to change the electronic information for the Name change and content showed for RUA Star co-produced by Dean Loren in retaliation for Loren reporting her for promoting political content using MNN monies and staff back in September 2013 and catching defendant Cory and her altering bookings on March 15, 2014.

227. On April 25, 2014, Loren reported Chris Gethard, defendant Zenaida and defendant Cory and Rich for terminating bookings of live shows without permission to Gloria, Sissy, Sistatalk, Harold, Paula Gloria, and Frank Craven.

228. On April 25, 2014, defendant Chris Gethard invited Dean Loren on his show and when Loren asked to bring the band, defendant Gethard refused although defendant Gethard admitted he screwed Loren over by taking his bookings on previous nights when defendant Zenaida terminated the bookings for defendant Chris to get out the Fake OWS National TV Message .

229. On June 4, 2014, Producers met in Manhattan Borough President's office to discuss Banning of Producers without Fair Hearings and other abuses.

230. On July 6, 2013, Halleck and Melendez met defendant Coughlin by chance at a mutual friend's private party in the Catskills, to which all three had been invited.

231. Melendez politely sought to address his status at MNN with defendant Coughlin.

232. Defendant Coughlin angrily replied that it was not the appropriate time to discuss the matter.

233. On July 10, 2014, defendant Coughlin started looking at which producers with series he could terminate.

234. During the month of July 2014, Producers including Loren started asking for MNN Board documents concerning the sale of the West 59th Street Station and Channel 57.

235. On July 25, 2014, Loren contacted the League or Woman Voters to pre-empt defendant Zenaida and defendant Cory terminating live studio bookings for the fall of 2014.

236.    On July 29, 2014 Manhattan Borough President Gale Brewer authorized her Chief of Staff Jessica Mates to issue a draft letter concerning the banning of Producers and other infractions by MNN which was copied to Deedee, Lidya, defendant Gloria, Alan, Dean, Josh and Paula Gloria.

237.    On July 29, 2014, Dean Loren complained to Board Secretary Vanessa Corwin about defendant Cory attempting to ban Loren without anything in writing and openly complained about defendant Cory and Rich deleting Loren's bookings without authority and defendant Jeannette for refusing to schedule us and acting against policy and copied to Greg, Cory, Gloria, Lidya, Paula.

238.    On or about July 30, 2014, defendant Cory banned Dean for catching defendant Cory and defendant Jeannette from terminating his Studio 1 live booking schedule and complaining to Gregg Sutton and others and refused to turn over security videos showing Jeannette's fraud.

239.    On July 31, 2014, Joe Barton pointed out to defendant Coughlin his director violations regarding fiduciary duties, and failure to issue procedures for fair hearings and that Deedee was banned with out a hearing.

240.    On July 31, 2014, Loren filed with defendant Manhattan Borough President Brewer that Greg Sutton was banning Dean Loren without any written procedures, failing to produce written complaints, letting him know who, what, when the facts are and witnesses.

241.    On July 31, 2014, MNN's Code of Conduct stated that everyone at MNN including defendant Zenaida, defendant Cory, Rich and defendant Jeannette had to behave respectfully.

242.    On July 31, 2014, Dean Loren attempts to resolve the issues with Greg Sutton concerning Loren's banning.

243.    On August 1, 2014, Dean Loren contacted Deedee.

244.    On August 1, 2014, at 1 PM, Greg called defendant Gloria Messer to investigate and was told by Gloria that I exited very upset and that she did not observe Jeannette.

245.    By letter to plaintiff dated August 1, 2013, defendant Coughlin suspended plaintiff Melendez from all MNN services and facilities indefinitely.

246.    Defendant Coughlin stated -- falsely--that during the chance encounter on July 6, 2013, Melendez said he wanted to and was going to "fuck me up."

247.    Defendant Coughlin further stated--falsely-- that Melendez engaged in a disrespectful and loud confrontation with Morales in March 2012, necessitating staff intervention.

248.    Defendant Coughlin also stated--falsely--that in July 2012 outside the El Barrio Firehouse Melendez was involved in a threatening altercation with an invited MNN guest (Jose Angel Figueroa) following an exchange of insults.

249.    On information and belief, defendant Coughlin suspended Melendez from all MNN services and facilities indefinitely because Melendez had attended regular quarterly meeting of MNN Board on Wednesday evening, March 14, 2012 with Halleck and expressed his views in the 1% video and Loren with other producers were mounting campaigns to demand Board access.

250.    By letter to Halleck dated August 9, 2013, defendant Coughlin suspended Halleck for one year effective immediately from all MNN services and facilities.

251.    Defendant Coughlin repeated his false assertions about Melendez's words and actions during the chance encounter on July 6, 2013.

252.    Defendant Coughlin further asserted that MNN continued to be in receipt of complaints about the public posting on the internet of Halleck's 1% video on YouTube, though he did not state the nature of the complaints, the number of complaints, or who made the complaints.

253.    On August 11, 2014, every channel played their shows at 4:30 PM, but Ch. 56 which my show was suppose to be streamed on and played was not shown.

254.    On August 14, 2014, Loren complains to the Tape Library that someone was taking my shows submitted by FTP transfer and deleting the audio and re-uploading the sabotaged show MNN.

255.    On August 18, 2014, Lalit Jain, Esq. submits Loren's Driver License and Phone bill to MNN.

256.    On August 22, 2014, Lalit Jain, Esq. requests Loren's re-instatement to Greg Sutton, and defendant Manhattan Borough President Gale Brewer.

257.    On August 20, 2014, producers organized filing complaints against defendant Time Warner Merger and the Sale of MNN Assets.

258.    On Friday August 22, 2014, Lidya Radin speaks with defendant Manhattan Borough President Gale Brewer's Chief of Staff Jessica Mates to complain about the banning of producers without fair hearings. Video Audio recording: https://www.youtube.com/watch?v=u3-3jzvkGlE.

259.    On Saturday August 23, 2014, Lidya and producers organize a meeting at MNN's conference room and for producers also to call in and participate.

260.    On August 23, 2014, Lidya emails defendant Cory asking who represents the Producers on the Board and copies to defendant Manhattan Borough President Gale Brewer's COF Jessica Mates, Dean, Deedee, Paula Gloria, Gabrielle, and Alan.

261.   On August 25, 2014, Loren had to cancel his show times with the League of Women Voters because of defendants Cory, Jeannette, Greg and Dan's actions.

262.   On August 26, 2014, Lalit Jain, Esq. receives on Dean's behalf Gregg Sutton's letter banning Loren without producing any underlying written complaints or witnesses.

263.   On or about August 30, 2014, MNN producers have their first meeting in the conference room to discuss the banning of producers without hearings and other issues concerning representation of their rights to a hostile MNN Board and staff.

264.   On September 1, 2014, Political Content of Robert Jackson created by MNN plays on Channel 34 opposite Loren's Little Valley Music on Channel 56.

265.   On September 2, 2014, Loren could no longer produce Are You A Star which he had been doing since 2004 for the last ten years without incident except deletion of bookings by MNN.

266.   On September 6, 2014, Producers planned another meeting on October 6, 2014 to discuss MNN's actions in banning producers without fair hearings and other items.

267.   On September 8, 2014, defendant Gloria rallied the Producers to fight Comcast.

268.   On September 14, 2014, defendant Gloria expressed fear/retaliation by MNN if she came out and complained against Greg for violently yelling at her with threats of banning on July 10, 2014.

269.   On information and belief, On September 14, 2014, Greg met with defendant Gloria to bribe or threaten her to be quiet in an effort to keep his violent actions on July 10 off the record.

270.   On September 16, 2014, defendant Coughlin bans Loren without a fair hearing.

271.   On September 17, 2014, Cory started harassing Lidya Radin over residency for no reason.

272.   On September 23, 2014, Producers videotaped their meeting discussing MNN abuses and banning producers.

273.   On September 23, 2014, Lidya contacted Vanessa Corwin ask about her Board duties to represent her about retaliatory gestures made by Cory copied to defendant Gethard, Coughlin, Halleck, Paula Gloria, Dean, Gabrielle, defendant Gloria, Kavesanky, Harold, Josh, Kristal, Lee, Phil, Betsy, Joan Allen, Sistatalk, Sissy, Joe Friendly, Molly, and Alan.

274.   On September 23, 2014, Greg contacts Lidya about defendant Cory's retaliatory gesture, Skype services in the mini-express and other complaints.

275.   On September 24, 2014, La-Verne Cody Gittens complained about defendant Cory calling the police on the meeting on the Second Floor in an effort to union bust the producer meetings.

276.    On September 23, 2014, Cory and defendant Jeannette gave Lidya a week to get her documents for residency to be submitted.

277.    On September 23, 2014, La-Verne Cody attempts a takeover of the Producer Organizing just like she did back in 1997 and then caused the Producers Organizing to disband from her actions.

278.    On September 24, 2014, Lidya contacted defendant Manhattan Borough President Gale Brewer to complain that Cory retaliated against the Producers by claiming Lidya was trespassing and having police with tape over their badges (videotaped) arrive to break up the meeting.

279.    On September 25, 2014, US Senator Dean Heller is questioning FCC Secret Meetings about Comcast and Robert B. Schumer, and Dean Loren contacts the US Senator to report MNN.

280.    On October 13, 2014, Loren appeals defendant Coughlin's September 16, 2014 on the basis there was no fair hearing or opportunity to know witnesses or have any written complaint and copies the FCC and the Entire Board of Directors of MNN.

281.    On October 17, 2014, Lalit Jain, Esq. files Loren's formal appeal to Tom Wheeler , Chairman of the FCC, Commissioner Roest of the NYC DOT and Peter Frank Chair of MNN's Board.

282.    On October 30, 2014, Lalit Jain, Esq. files a formal notice of a nullity regarding the Actions of MNN to ban Loren without a hearing or written complaints and witness statements to Peter Frank, MNN Board Chair.

283.    On November 5, 2014, Board by Dan Coughlin rejects Loren's appeal to the MNN Board of Directors.

284.    On January 23, 2015, Loren files his Notices of Claim with the City of New York against DOT Com. Anne Roest, MBP Gale Brewer, Scott Stringer, Time Warner and MNN Board Chair Peter Frank.

285.    On January 28, 2016, Loren attends Deedee Halleck's action against MNN on the 20th Floor, 500 Pearl Street at 10:00 AM.

286.    On January 28, 2016, Lidya Radin was attacked by an unidentified black hispanic man working for Inter-Con Security.

287.    On information and belief, Inter-Con Security was attempting to target both Dean Loren and Lidya Radin into incidents to manufacture fake violence against them to support arrests.

288.    On June 28, 2014, while attending another hearing about Lidya Radin, another Inter-Con Security Agent attempted to jump Eric and Dean at the elevators as they were leaving.

289. Disregarding Melendez's full statement, defendant Coughlin continues to assert "the fact remains that the words 'kills them' were used in a direct reference to MNN staff who work at the MNN El Barrio Firehouse and Coughlin refuses to produce any written statements against Loren.

290. Disregarding all of Loren's evidence, witness statements, defendant Coughlin continues to ban Loren without a fair hearing and to conceal the MNN Article 9 Yearly Financial Planning Report.

291. In closing, defendant Coughlin warned both Halleck and Loren that "future failure to follow MNN policies may result in permanent suspension from accessing MNN facilities and services."

292. Defendant Coughlin then without any fair hearings or written statements, or witness statements, Coughlin acted to ban Halleck for one year, and Melendez and Loren indefinitely.

293. In closing, defendant Coughlin stated that MNN had "zero-tolerance for harassment or threats of violence of any kind towards MNN staff, producers or users" yet selectively did not enforce it against Zenaida, Cory, Rich, Jeanette, Devorah, and other producers of MNN who attacked Loren.

294. On information and belief, defendant Coughlin suspended Halleck for one year from airing programs over MNN's cable public access channels because Halleck's 1% Video presented views that MNN was "more interested....." and reveals Inter-Con Security contracted guards.

295. On information and belief, defendant Coughlin suspended Loren indefinitely for exposing Zenaida, Rich, Cory, Jeanette for terminating, deleting and altering computer bookings of producers for retaliation, to make money selling services and/or to make political content.

296. Although Halleck's one-year suspension from MNN's services and facilities ended on August 9, 2014 she still cannot air "the 1% Video" program on MNN's cable public access channels or, for that matter, any programming in which Melendez appears, since Melendez is barred from MNN services and facilities.

297. On April 17, 2015, Melendez visited MNN's 59th Street facility to submit a "Project Request For" for a cable public access program entitled "El Barrio (East Harlem) Commnity Poet, Jesus Papoleto Melendez Chats with El Barrio's ArtSpace P.S. 109 Rsidency-Artists."

298. Halleck accompanied Melendez, to video Melendez submitting the "Project Request Fort" to MNN employees.

299. Defendant Bryce, MNN's Manager of Production & Facilitation, informed Melendez during the visit that he was still suspended from all MNN services and facilities indefinitely.

300. Inter-Con MNN security officers escorted Melendez from the building.

301.   By letter to Melendez dated April 24, 2015, defendant Bryce returned Melendez's "Project Request Form."

302.   Defendant Bryce stated that Melende's indefinite suspension from services and facilities remained in full force and effect and that Melendez was not permitted to access any MNN facility, equipment or service.

303.   Defendant Bryce also stated -- falsely-- that Melendez's indefinite suspension was due to Melendez's pattern of harassment, threats and violent conduct toward MNN staff and facility users in 2012 and 2013.

304.   Def Bryce stated that the videotaping during Melendez's April 17, 2015 visit to MNN 59th Street was disrespectful and in direct violation of MNN's Code of Conduct which prohibits "Video, photo or audio recording of any employee, users or guest without their informed consent."

305.   Notwithstanding his attempted assault and battery on Melendez on July 19, 2012, Jose Angel Figuerora continued to have access to MNN services and facilities after that date.

306.   The City and Time Warner are aware that MNN has censored Halleck, Loren and other cable public access programming, as MNN producers brought the censorship to the MBP Gale Brewer's attention on or about June 10, 2014 and Loren wrote the CEO of Time Warner repeatedly.

FACTS SURROUNDING INTER-CON ASSAULT ON RADIN AT HALLECK'S HEARING
BEFORE JUDGE PAULEY ON THE BANNING OF MNN PRODUCERS AND THE
PRODUCTION OF THE MNN BY-LAWS ARTICLE 9 FINANCIAL PLAN EXPOSED
BY DEEDEE HALLECK WHEN SHE VIDEOD THE 1% MNN VIDEO

307.   Plaintiff repeats and realleges paragraph "1" through "55" with the same force and effect as if they were fully set forth herein within the Statement of Facts and also see Affidavits attached.

308.   As a result of the foregoing, Plaintiff has suffered emotional distress, mental anguish, embarrassment, humiliation, and violation of his constitutional rights and loss of studio access.

309.   For Loren, his suspension from physically producing programs on the MNN cable access channels was especially embarrassing and humiliating --as well as ironic--since he has spent from 1994 to 2014 crewing and technically producing cable access programming for hundreds of producers who do not know how to run the Control Room.

310.   For Loren, his indefinite ban from all MNN services and facilities--now approaching two-one-half years-- was also especially embarrassing and humiliating as well as ironic-- given that Greg Sutton would bring in potential purchasers of Studio time and the Studio itself to see Loren run the control room during the live band tapings each Monday Afternoon.

311.   Loren has suffered and continues to suffer irreparable harm inasmuch as his free speech rights have been and continue to be denied as well as his right to associate with MNN Producers like Deedee, Radin, and Messer.

312.   Loren states that for MNN's Executive Staff threats to Gloria Messer, a 70 year old Jewish Woman, with being banned for reporting Greg Suttons vicious verbal attack on her on July 10, 2014 and, thus, forcing her to remain silent explains why so many Jews remained quiet during the Holocaust in the German, Polish and Italian Ghettos because the Jews were afraid of retaliation.

## FIRST CLAIM FOR RELIEF

(First Amendment Claim Under 42 U.S.C. §1983)

313.   Plaintiff repeats and realleges paragraphs "1" through "312" with the same force and effect as if they were fully set forth herein.

314.   Required by state regulation and local franchise agreements, the cable public access channels in Manhattan are a designated public forum of unlimited character.

315.   The City, through the Manhattan Borough President, has delegated control of that public forum to MNN.

316.   The City, through the Manhattan Borough President, has delegated control of that public forum to MNN.

317.   Defendants have barred and restricted plaintiff access to the above public forum based on viewpoints (i) expressed by plaintiff in his communications to federal, state and local officials that MNN was using resources and staff to create political content and (ii) very critical of MNN's administration and management of the cable public access channels in Manhattan, in violation of Plaintiff's rights to freedom of speech under the 1st Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF

(New York State Free Speech Claim)

318.   Plaintiff repeats and realleges paragraph "1" through "317" with the same force and effect as if they were fully set forth herein.

319.   Article 7 of the New York Public Officers Law ("the Open Meetings Law") declares, in part, that: "It is essential to the maintenance of a democratic society that the public business be performed in an open and public manner and that the citizens of this state be fully aware of and able to observe the performance of public officials and attend and listen to the deliberations and decisions that go into the making of public policy." N.Y. Public Officers Law Art. 7, §100.

320.  To accomplish that purpose, the Open Meetings Law provides that "[e]very meeting of a public body shall be open to the general public, except that an executive session may be called and business transaction therein in accordance with section one hundred five of the is article."

321.  A "meeting" is defined as "the official convening of a public body for the purposes of conducting public business ...." N.Y. Public Officers Law Art. 7, §102(1).

322.  A "public body" is defined as "any entity, for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof, or for a public corporation as defined in section sixty-six of the general construction law ...." N.Y. Public Officers Law Art. 7, §102(1).

323.  A "public corporation" is defined to include a municipality. N.Y. Gen. Mun. Law §66(1)-(2).

324.  As an entity which performs a governmental function for both the State and City of New York-- the administration and management of the cable public access channels in Manhattan-- MNN is a "public body" under the Open Meetings Law and is required to make the regular meetings of its board of directors open to the general public.

325.  MNN nonetheless continues to hold regular meetings of its board of directors without permitting the general public to attend and videotape the meetings in violation of the Open Meetings Law and to keep secret the MNN By-Laws Article 9 Mandated Financial Plan Reports which outline MNN's financial actions to be taken during the upcoming year.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against all the defendants:

(A) A preliminary and permanent injunction, restraining defendants from interfering with plaintiff's exercise of his free speech rights over the cable public access channels in Manhattan;

(B) A preliminary and permanent injunction restraining defendants from violating the Open Meetings Law by barring the general public from attending and videotaping regular meetings of MNN's board of directors;

(C) A preliminary and permanent injunction causing defendants to publish immediately each and every MNN By-Law Article 9 Mandated Financial Plan Report since MNN's inception.

(D) Compensatory damages in an amount of $50,000,000 and additional damages in an amount to be determined at trial;

(E) Punitive damages in the amount of $50,000,000 and additional damages in an amount to be determined at trial;

(F) MNN's ban of Loren, Radin, and Melendez to be extinguished and Loren, Radin and Melendez's full rights restored to MNN's facilities and equipment and air time.

(G) Loren's producer rights of Little Valley Music show to be transferred to the Comprehensive Education Program, Inc., as discussed by Sutton and Loren March of 2014.

(H) Little Valley Music to be scheduled on MNN's Channel 34/Channel One during evening prime time for one half hour for live broadcast of music in Studio One in compensation for years of harassment by Santiago.

(I) MNN to issue a public apology to Loren and Radin and hold a Producer's Open Meeting to give Radin, Loren and Halleck an award for Public Access which is to be presented by Gloria Messer and Paula Gloria.

(J) MNN to offer Loren, Radin and Halleck three seats on its board of directors as representative for Producers with one to Loren, one to Radin and one to Halleck from 2016 to 2019 or whatever the proper term length is designated by the By-Laws in the interest of representing Producers on the Board that the Board has violated since 1994.

(K) A temporary and permanent injunction against Chris Gethard from (i) broadcasting from MNN Studio the Night of the November 16, 2016 Presidential Elections by terminating RUA Star's booking like he and Zenaida did in November 2012 and (ii) eating in the Open Studio.

(L) A temporary and permanent injunction against MNN from keeping Secret the Producer Complaint files and to give immediately each and every Producer their full and complete complaint file and any additional complaints as they may be created within 24 hours.

(M) A temporary and permanent injunction against Inter-Con Security to wear identification on the outside of their uniforms identifying their True Names, Supervisors Contact Number and Firm Name.

(O) An injunction for Manhattan Borough President Gale Brewer to have Loren, Radin, Halleck and Melendez on her MNN show as guests as soon as possible and to issue a public proclamation for their good deeds in preserving public access and declare May 1 as Manhattan's official  "Public Access Defense Day".

(P) A temporary and permanent injunction for Enrique Hernandez, Jr. of Inter-Con Security to (i) deliver to Dean Loren his full and complete FBI File on Dean Loren as of September 9, 2016 and (ii) to run a full and complete security check on Dean Loren, and (iii) create a liaison position for Dean Loren at Inter-Con Security as an Ombudsman for complaints made by persons on Federal Properties against Inter-Con Security from 2016 to 2023 at a reasonable salary.

(Q) Robert Schumer and Time Warner Cable  to deliver to Loren digital copies of all the documents prepared for the sale of Time Warner Cable  assets from 2012 to 2014 to Charter Communications and/or Comcast.

(R) Rick Gethard to invite Loren on to his Fusion show for Pizza to get out the vote to the People of Color across the Nation and allow Dean Loren to bring the Band and show Fusion how to really do a television show to get out the vote legitimately and with great success.

(S) Reasonable attorney fees and costs of this litigation and

(T) Such other relief as this Court deems just and proper.


Dated: New York, New York
     September 9, 2016

Sworn to under penalty of perjury and respectfully submitted,

                                DEAN LOREN
                                deanloren@gmail.com
                                203 WEST 107TH STREET #8A
NOTARY              NEW YORK, NEW YORK 10025
MUHAMMAD AKHTAB       Mailing Address: PO Box 34, NY, NY 10002
Notary Public, State of New York
No. 01AK6258310           (646) 228-0408
Qualified in Queens County     Plaintiff
Commission Expires March 26, 20__

To:    Emily K. Stitelman, Esq.,Assistant Corporation Counsel
        Administrative Law Division
        New York City Department of Law
        100 Church Street
        New York, New York  10007
        Counsel for Defendant, The City of New York

        Tamar S. Wise, Esq.
        Michael B. de Leeuw, Esq.
        Cozen O'Connor
        275 Park Avenue
        New York, New York 10172
        Counsel for Defendants Manhattan Community Access Corporation, Daniel Coughlin

        Jonathan Schwartz, General Counsel,
        Univision Communications, Inc.
        605 Third Avenue, NY, NY 10158
        tel. 212 455-5200
        Contact for Chris Gethard

*F*

**AFFIDAVIT OF DEAN LOREN DATED SEPTEMBER 9, 2016 REGARDING THE EVENTS CONCERNING THE AUGUST 10, 2016 MEETING ON THE FIFTH FLOOR OF SDNY COURTHOUSE WITH MAGISTRATE PECK, LIDYA M. RADIN AND STEPHANIE LAKE FOR THE BENEFIT OF US MARSHALS/DOJ INTERNAL AFFAIRS, WASHINGTON DC**

Dean Lorens sworn, deposes, and says under penalty of perjury the following:

1. I attended a meeting on the 5th floor of 500 Pearl Street at 10 AM to which Lidya M. Radin was threatened to show up before Magistrate Peck by Magistrate Debra Freeman and AUSA Stephanie Lake and AUSA Ferrara for a Jan. 28, 2016 incident.
2. Prior to attending, no documents preceding August 8, 2016 were docketed on Radin's assigned index number 16 Crim 528, and on August 19, 2016 there were no documents preceding Aug. 8, 2016 docketed on the SDNY electronic filing system.
3. CJA Joshua Levine assigned by Judge Debra Freeman without Radin's consent led Radin to believe she could review AUSA Lake's evidence prior to 08/10/16. Public Defender Gatto had been removed for similar non-consent actions in Radin's case.
4. A Public Defender arrived at 9:50 AM and began discussing Radin's case with AUSA Lake and Ferrara at the Prosecution Table without first speaking with Radin.
5. Radin asked him who he was and under what authority did he have to speak to the AUSAs concerning her action without speaking to her first.
6. The Public Defender from the CJA docket neither had authority nor permission to act, and he stopped talking to AUSA Lake only after Radin shamed him.
7. The Inter-Con Security Court Officer who gave the order for Lidya Radin to be arrested on July 7, 2016, sat in the back pew texting while sitting next to a black female DHS CSO and another black female CSO came in and sat in the back pew.
8. US Marshal Locke has been the only US Marshal consistently attending these "meetings" that Lydia M. Radin has been threatened to attend.
9. Magistrate Freeman's Court Deputy Clerk came in and dropped off a file.
10. Peck had a rather large file in front of him concerning Radin when the EFS only showed a few documents as of August 8, 2016 docketed.
11. Inter-Con Security Court Officer cited above made sure he went to every US Marshal and greeted using the word "Bro" that established his "Blue Line Brotherhood."
12. During this meeting, and that is the only word to call it as AUSA Lake refuses to produce any signed complaint identifying the time date and place and who Lidya was suppose to assault on Jan. 28, 2016, with the issuance of a violation ticket.
13. I was the only live witness beside Mr. Robert Perry to the January 28, 2016 assault on Ms. Radin by this Black Hispanic Inter-Con Security CSO who refused to identify himself and who attacked Radin as she was leaving to enter the elevator on the 20th floor of 500 Pearl Street after a hearing before Judge Peck for Deedee Halleck being banned by MNN and the filed lawsuit against the City.
14. In a moment of frustration, Magistrate Peck admitted openly to what was a minor infraction has now become a misdemeanor. Emphasis on "Minor Infraction".
15. However, no documents exist for him to make such a conclusion as I was there on July 7, 2016 when Magistrate Freeman heard AUSA Lake attempt to charge Radin with a Felony Assault with a $100,000 fine and one year in jail.
16. The only information Magistrate Peck could have was when on January 28, 2016, US Marshals, Inter-Con Security, US Attorneys and Judge Pauley's Deputy Clerk Kyle O. Wood all met with Peck after walking in front of me and entering Peck's court to

have an ex-parte meeting while Lidya was handcuffed to the bench outside and I was held arrested on the opposite bench outside Judge Pauley's Courtroom on the 20th floor.  Peck's information could have only come from ex parte communications.

17. Magistrate Peck then attempted to select a Judge to hear about this "meeting".

18. Magistrate Peck got up from the Bench deliberately to walk stage left to a table with several wheels which was so out of character that I knew to keep my eye on the dais.

19. I watched Magistrate Peck's Deputy Clerk had the wheel and specifically delivered it to Peck's dais without spinning it and made sure it didn't spin.

20. I watched Peck's feint going stage left and never lost sight of Peck's Deputy Clerk's possession of the "Wheel" specifically putting his hand to keep it from spinning.

21. Peck's Deputy specifically kept his hand on the wheel to keep it from moving and carried it with the other hand and carefully placed in on Peck's right.

22. Peck then selected a designating judge slip without spinning the wheel and choosing specifically the slip on top of the pile positioned at the door opening.

23. Peck and the Court Deputy had rehearsed this scenario many times from their movements in keeping the wheel in position. Since 1994 I have done tv cameras.

24. This old "CARNI" ruse is used frequently in the South and was expected.

25. Peck selected Judge Pittman who I believe is associated with Yeshiva.

26. Peck then went on to assign bail without any proof that any was needed.

27. In fact Peck assigned bail without any signed charging statement saying who was assaulted, when the assault took place, what time the assault took place, who witnessed the assault,  and the events surrounding the incident.

28. Most importantly, the facts surrounding Judge Pauley have been left out including that CSO Kyle O. Wood quit his job with Pauley and fled the Court to a job most likely arranged by Judge Pauley in the Suffolk County DA's office.

29. I attach drawings of the Inter-Con Security CSO who calls everyone "Bro".

30. Peck read Radin her Miranda Rights when he should have read Stephanie Lake her Miranda Rights for entering false statement onto a federal court docket.

31. Again, I was the only other witness at the scene of the Inter-Con  Security CSO attacking Lidya Radin on January 28, 2016.  Perry I believe has been threatened to remain silent and did in fact lie that he saw nothing when he was caught on video.

32. No Marshal, no AUSA, no one for the prosecution has bothered to ask what I saw.

33. Lastly on July 7, 2016, I was violently pushed by US Marshal Young just moments after the Inter-Con Security CSO gave the order to arrest Lidya Radin which I believe is what Lidya is supposed to be charged with by AUSA Lake.

34. US Marshal Young pushed me when I was at the extreme front and maybe some 15 feet from any other people accompanying Ms. Radin, and he did so violently push me so that I would not see her arrest and actively participated in false prosecution.

Sworn to before me this
September 9, 2016

_____
Notary Public

Dean Loren
PO Box 34, NY, NY 10002
718 277 1367

MUHAMMAD AKHTAR
Notary Public, State of New York
No. 01AK6258310
Qualified in Queens County
Commission Expires March 26, 20

**For the public record: Affidavit of Lidya Maria Radin in connection with the Independent Producers' Union and the unlawful banning of Dean Loren, and other unlawful actions against Dean Loren.**

*I, Lidya Maria Radin, a live woman, 203 W. 107th Street, #8A, New York, New York, 10025, telephone: 516-445-4390, am of full age, am competent and willing to testify, and having personal, first-hand knowledge of the facts stated herein, swear to the following, under penalty of perjury:*

"We and Dean Loren" means Myself and other Independent Producers including at various times but not limited to Attorney Terry Bankert, Dee Dee Halleck, Josh Volinsky (note: Josh Volinsky's name is sometimes mis-spelled as Volinski ), Gloria Messer, Alan Steinfeld, Paula Gloria Barton, Joe Barton, Amber Johnson, Barbara Rosenfeld, Frank Craven, Joe Friendly, Harvey Wiesenberg, William Dorrity, Jayson Burg, and others.

**Issue:** Because the independent producers did not have representation by another producer(s) on the Board of Manhattan Neighborhood Network ( MNN ) all MNN's contracts are void as violating MNN's founding agreements.

1. I started broadcasting my TV show "Crooked Doctors at the Albert Einstein College of Medicine of Yeshiva University " ( Crooked Doctors ) on or about early 2010 until late 2014 wherein I exposed wrongdoing by crooks associated with this organized crime entity.
2. Take Judicial Notice of the fact that I was featured in an Epoch Times news article, the weekend cover and a full-page article in the June 13-19 2014 edition which was distributed in the greater New York region and as far into New Jersey as Newark.
3. This article contained a few errors which MNN's Cory Bryce, Greg Sutton, and Daniel Coughlin used to trump up excuses to harass me from August to November 2014.
4. Ultimately, I was unlawfully banned from MNN in late November 2014.
5. In addition to being my co-host and co-producer on Crooked Doctors Josh Volinsky is and was an Independent Producer in good standing residing in Manhattan for at least the past eleven years.
6. My co-hosts and co-producers Josh Volinsky, William Dorrity, and Jayson Burg were unlawfully prevented from producing and broadcasting "Crooked Doctors " without Me and without cause from August to November 2014.
7. On or about late November 2014 I was unlawfully banned from MNN.
8. To date, MNN failed and refused to provide Me with a reason for banning Me.
9. MNN failed and refused to provide Me with a reason for banning Me despite good-faith efforts on my part to resolve this issue with Cory Brice, Jeannette Santiago, Greg Sutton, and Daniel Coughlin of MNN and their attorneys and attorneys for the City of New York notably

Emily Stitelman and her supervisors in the New York City Law Department from August 2014 to now.

10. The City of New York failed and refused to respond to my Notice of Claim which included claims by Josh Volinsky, William Dorrity and Jayson Burg, timely made.

11. MNN failed and refused to provide Me with a reason for banning Me despite good-faith efforts to resolve this issue with Gale Brewer, Manhattan Borough President, Jessica Mates, Brewer's chief of staff, and James W. Caras, General Counsel & Director of Land Use, for Gale Brewer.

12. My most recent interaction with Gale Brewer, Manhattan Borough President, in connection with this issue was just a few weeks ago when she asked me to follow up with Jessica Mates, her Chief of Staff.

13. In addition, in the past few weeks, Gale Brewer's office recommended that I make a complaint with the Mayor's office about New York City Law Department Attorney Emily Stitelman and the New York City Law Department's efforts to deceive federal Judge Pauley in Halleck et al v. City of New York, et al, docket number: 15-cv-8141, Southern district of New York.

14. To date, MNN never provided me with a hearing in connection with my unlawful banning.

15. We and Dean Loren discovered that MNN has a pattern and a practice of banning, suspending and taking other adverse action against Independent Producers without a hearing going back at least ten years in a conspiracy against rights under color of law.

16. Cory Bryce made a false police report about me, a crime, on September 23, 2014, to disrupt a peaceful Independent Producers' Union meeting on September 23, 2014, documented by Paula Gloria Barton in her September 23, 2014 video.

17. Take Judicial Notice of Paula Gloria Barton's September 23, 2014 video, see link https://www.youtube.com/watch?v=b4YOmZfvkLo.

18. Take Judicial Notice that in Paula Gloria Barton's September 23, 2014 video she also documented an Independent Producers' meeting that we and Dean Loren organized and held on August 23, 2014 wherein Dean Loren conference called into the meeting.

19. MNN is required to have a producer or producers represent the interests of other producers on its Board of Directors as per MNN's founding agreements.

20. From 2010 to now, I made good-faith efforts to communicate with my producer representative(s) on MNN's Board of Directors.

21. To date, my producer representative(s) on MNN's Board failed and refused to communicate with me.

22. According to Daniel Coughlin, Vanessa Cordova-Corwin was my producer representative on MNN's Board in 2014.

23. During summer 2014, I reached out to Vanessa Cordova-Corwin.

24. Vanessa Cordova-Corwin failed and refused to meaningfully speak with me about my concerns and issues, in specific, and those of producers, in general.

25. Vanessa Cordova-Corwin stated that she was not permitted to speak with me, an absurdity.

26. Vanessa Cordoav-Corwin stated that she was not permitted to speak with any of MNN's independent producers, another absurdity.

27. On information and belief, subsequently Vanessa Cordova-Corwin was removed from MNN's Board.

**Issue:  Independent  Producers Organizing and Unionizing**

28.  On or about January 2014 we and Dean Loren began organizing and unionizing an Independent Producers Union to protect our rights, and our intellectual property, and in response to various proposed sales and/or mergers of Time-Warner Cable with other corporations that would impact on Manhattan residents and their ability to exercise their right to Free Speech as provided for in MNN's mission statement(s) and founding agreements.

29. On or about February 2014 we and Dean Loren organized another meeting at which Dee Dee Halleck was present.

30. At this meeting Dee Dee Halleck discussed MNN unlawfully banning her in retaliation for making a video that was critical of MNN's CEO Daniel Coughlin in violation of her right to Free Speech and MNN's mission statement(s) and founding agreements.

31. On or about May to June 2014 we and Dean Loren organized another meeting at the Manhattan Borough President's office, Gale Brewer's office, with Jessica Mates, Gale Brewer's chief of staff.

32. As Jessica Mates admitted Gale Brewer, Manhattan Borough President, had been in this elected office for about a year without taking her seat on MNN's Board and without appointing two other Board members.

33. Because of conflicting schedules, Dean Loren and other Independent Producers who were unable to attend asked me to represent them.

34. At this meeting Dee Dee Halleck discussed with Jessica Mates agent for Gale Brewer, Manhattan Borough President, the fact that MNN unlawfully banned her in retaliation for her criticisms of MNN's CEO Daniel Coughlin in violation of Halleck's right to Free Speech and in violation of MNN's mission statement and founding agreements.

35. At this meeting Dee Dee Halleck discussed in some detail with Jessica Mates agent for Gale Brewer, Manhattan Borough President, the fact that Dee Dee Halleck had made good-faith efforts to resolve MNN's unlawful adverse actions against her with various responsible city and state agencies and that those city and state agencies/offices/departments failed and refused to take effective action.

36. From May/June 2014 to now there were follow up emails, phone calls, meetings with the Manhattan Borough President's office, Gale Brewer's office and Me.

37. We and Dean Loren communicated with Terry Bankert, an attorney in Flint, Michigan.

38. Terry Bankert, an insider, shared information regarding Time-Warner Cable's nation-wide effort to eliminate Public Access TV channels and to commercialize as we were witnessing at MNN.

39. Terry Bankert gave Me an audio-taped statement to be played to the Independent Producers Union meeting that we and Dean Loren organized for September 23, 2014 because Bankert's busy schedule would not permit him to conference call in to talk to the Independent Producers in real time.

40. To prevent Me from playing Terry Bankert's audio-taped statement to the Independent Producers Union at the meeting that we and Dean Loren organized for September 23, 2014 Cory Bryce made a false police report about Me, a crime, and had Me removed by unlawful force from MNN's building on West 59 th Street, a place of public accommodation, as documented and publicized by Paula Gloria Barton in a video that she made of these events.

41. Take Judicial Notice of Paula Gloria Barton's September 23, 2014 video, see link https://www.youtube.com/watch?v=b4YOmZfvkLo.

42. Alan Steinfeld, Paula Gloria, Frank Craven and others used various techniques to protect Me from imminent physical harm directed against Me by Cory Bryce and MNN as they used the police unlawfully to disrupt a peaceful Independent Producers Union meeting on September 23, 2014 and to have Me removed unlawfully by force from a place of public accommodation.

43. On or about late November 2014 the harassment by MNN against me solidified into an unlawful banning.

44. I was banned from MNN without cause, without reason, without notice and unlawfully not provided with a means of redress.

45. Sometime between August and November 2014 at a meet-and-greet social event at MNN Greg Sutton told Josh Volinsky my co-producer and co-host not to appear on my show Crooked Doctors to impermissibly censor the content of my TV shows as sworn to by Josh Volinsky in an affidavit already provided to the City of New York in my Notice of Claim.

46. My Notice of Claim included claims for my co-hosts and co-producers Josh Volinsky, William Dorrity, and Jayson Burg.

47. My Notice of Claim and Dean Loren's Notice of Claim were filed as exhibits in Halleck et al v. City of New York et al, docket no: 15-cv-8141, Southern district of New York, in January 2016.

48. On January 28, 2016 Dean Loren and I attended a so-called hearing in Halleck v. City of New York, docket number: 15-cv-8141.

49. We exposed the fact that all the attorneys involved colluded to deceive federal Judge Pauley and us as parties in violation of New York Judicial law section 487, misconduct by attorneys.

50. As Dean Loren and I were leaving the federal courthouse after the so-called hearing in Halleck, I was physically assaulted without cause by an Inter Con Security Systems security guard, agent of the U.S. Marshals.

51. Take Judicial Notice of un-rebutted and accepted as fact, supportive affidavits regarding the unwarranted assault on Me by men and women of good conscience in Halleck v. City of New York, docket no: 15-cv-8141 and in my Verified Petitions for a Writ of Habeas Corpus, docket numbers: 16-cv-6307 and 16-cv-6724.

52. Take Judicial Notice of a news article provided by Full Disclosure Network regarding shutting up the little guy by getting rid of Public Access TV channels in Halleck v. City of New York, docket no: 15-cv-8141.

53. In connection with the unwarranted physical assault on Me by an Inter Con Security Systems security guard on January 28, 2016, Kyle O. Wood, a law clerk to federal Judge Pauley, had impermissible ex-parte communications regarding Me with Magistrate Andrew J. Peck on January 28, 2016 as I am sui juris, and speak for Myself.

**Issue:** **The U.S. Marshals colluded with Assistant United States Attorneys in a conspiracy to deprive rights.**

54. On February 4, 2015 Me and Anne Wolinsky made good-faith efforts to communicate facts regarding constitutional violations and racketeering to the federal Grand Jury located at 40 Foley Square, New York, New York.

55. For constitutional violations and racketeering, defined as collection of an illegal debt, U.S. Attorney Preet Bharara must prosecute the wrongdoers against Me, Anne Wolinsky, and others including Independent Producers, see In the Matter of In Re Grand Jury Application 617 F. Supp 199 ( 1985, S.D.N.Y.).

56. In response to our good-faith efforts to report racketeering and constitutional violations to the federal Grand Jury as is our duty, Deputy U.S. Marshal James H. Howard, and Homeland Security Officer Sandrowsky inflicted the crimes of false arrest, false imprisonment, unlawful search, unlawful seizure against Me in connection with violation H5118172.

57. Anne Wolinsky was subjected to false arrest and false imprisonment as well.

58. In October 2015 violation H5118172 against Me was dismissed.

59. Me and Anne Wolinsky made Federal Tort Claims, by filling out and filing SF-95 federal tort claim forms for malicious prosecution, abuse of process, false arrest, false imprisonment, unlawful search and unlawful seizure.

**Issue:** **Attacks in the federal courthouse against Me and Dean Loren for exposing the truth.**

60. In November 2015 Dee Dee Halleck filed a federal lawsuit against MNN in Halleck et al v. City of New York, et al, Southern district of New York, docket no: 15-cv-8141.

61. Me, Dean Loren and the other Independent Producers were forced into a position wherein we had to make Motions to Intervene as of Right.

62. Emily Stitelman an attorney with the New York City Law Department, her supervisors, the attorneys for Daniel Coughlin, Cory Bryce, Jeannette Santiago colluded and conspired to deceive federal Judge Pauley and us as parties in Halleck v. City of New York, in violation of New York Judicial law section 487, misconduct by attorneys.

63. Dean Loren, Me, and other men and women of good conscience exposed their wrongdoing.

64. We were and are being subject to retaliation for telling the truth, to shut us up.

65. We were and are being tampered with as witnesses.

66. Take Judicial Notice of un-rebutted and accepted as fact, supportive affidavits by men and women of good conscience in Halleck v. City of New York, docket no: 15-cv-8141 and in my Verified Petitions for a Writ of Habeas Corpus, docket numbers: 16-cv-6307 and 16-cv-6724.

67. I reserve the right to Supplement this affidavit.

*Lidya Maria Radin*

Lidya maria Radin

9- September - 2016

MARK B. LINDE
Notary Public, State of New York
No. 01LI6121090
Qualified in Westchester County
Certificate filed in New York County
Commission Expires Jan. 10, 2017

09/09/16